**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LORNA CEASAR,                                                    Case No. 1:12-cv-548

             Plaintiff,                                          Spiegel, J.
                                                                Bowman, M.J.
      v.

COMMISSIONER OF SOCIAL SECURITY,

             Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Lorna Ceasar filed this Social Security appeal in order to challenge the Defendant's determination that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error, all of which the Defendant disputes. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED because it is supported by substantial evidence in the administrative record.

**I. Summary of Administrative Record**

Plaintiff filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") in October 2008, alleging disability beginning on October 23, 2007 due to a combination of mental and physical impairments. After Plaintiff's application was denied initially and upon reconsideration, she requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). At a hearing held in June 2010, ALJ Christopher McNeil heard testimony from Plaintiff, from a medical expert, and from a vocational expert. On October 12, 2010, the ALJ denied Plaintiff's application in

a written decision, concluding that Plaintiff was not disabled. (Tr. 13-22). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the Defendant's final determination.

Plaintiff was 54 years old at the time of the hearing, with a high school education.[1] She previously worked as a housekeeper, but has not engaged in substantial gainful activity since her alleged disability date. (Tr. 15, 21). Based upon the record and testimony, the ALJ found that Plaintiff has the severe impairments of: "diabetes with neuropathy, hypertension, nonobstructive coronary artery disease, osteoarthritis, mood disorder, not otherwise specified, and panic disorder." (Tr. 15). These impairments did not alone, or in combination with any other impairments, meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 16). Rather, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work, with the following additional limitations:

> She can sit, stand, or walk for a total of 6 hours each in an 8-hour workday. She can occasionally use ladders, ropes, or scaffolds, and stoop, and she can frequently use ramps or stairs, balance, kneel, crouch, or crawl. Mentally, the claimant can understand, recall, and carry out simple and detailed instructions, and she can concentrate and persist at simple and detailed tasks in 2-hour segments. She can have occasional contact with the general public and she can adapt to routine changes in a work setting.

(Tr. 17). The VE testified that an individual limited in the manner described in the ALJ's first hypothetical question could still perform Plaintiff's past relevant work as a housekeeper/cleaner, or as a dietary aid. (Tr. 68-69). Based in part on this testimony,

---

[1]Plaintiff asserts that she has a tenth grade education (Doc.11 at 2), but previously testified and stated in her application that she graduated from the twelfth grade. (Tr. 59, 67, 174). The VE testified that her educational abilities were consistent with "at least" that education level. (Tr. 67).

the ALJ concluded that Plaintiff remained capable of performing her past relevant work as a housekeeper.  (Tr. 21).  Accordingly, the ALJ determined that Plaintiff is not under disability, as defined in the Social Security Regulations, and is not entitled to DIB or SSI. (*Id.*).

On appeal to this Court, Plaintiff argues that the ALJ erred: (1) by failing to include any handling, fingering and feeling limitations assigned by Drs. Burris and Ezike, and by failing to adequately consider Plaintiff's carpal tunnel syndrome; (2) by improperly weighing medical opinion evidence of two consultants and one treating physician; and (3) by improperly assessing Plaintiff's credibility.  All three of the stated errors pertain to Plaintiff's alleged physical impairments; therefore, Plaintiff has waived any arguments pertaining to her alleged mental impairments.  *See Stiltner v. Com'r of Soc. Sec.*, 244 Fed. Appx. 685, 686 (6th Cir. 2007).  As discussed below, the ALJ committed no reversible error that would require remand.

**II.  Analysis**

**A.  Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a

4

significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. However, a plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability or supplemental security benefits. *See* 20 C.F.R. § 404.1512(a).

### B. Plaintiff's Assertions of Error

### 1. Failure to Include Fingering, Handling and Feeling Limitations

Plaintiff alleged that she has carpal tunnel syndrome ("CTS") but the ALJ determined that Plaintiff's CTS was not severe, based upon a lack of evidence that her CTS causes "more than minimal interference with the claimant's ability to engage in basic work-related activities." (Tr. 16). Plaintiff argues that, despite giving "significant weight" to the May 29, 2006 opinion of non-examining consultant Dr. Michael Burris[2] and "some weight" to the opinion of a medical expert who testified at the hearing, the ALJ erred by failing to include in Plaintiff's RFC the limitations based on her CTS, that both of those physicians offered in handling, fingering and feeling.

Dr. Ezike, who is board-certified in internal and occupational medicine, completed medical interrogatories on behalf of the agency and testified as a medical expert. (Tr. 33, 649-655). While adopting many of Dr. Ezike's opinions, the ALJ explained that he was rejecting the opinion that any CTS-related limitations were required, based upon the lack of "evidence that CTS remains an impairment following the claimant's treatment in 2006." (Tr. 20).

---

[2]Dr. Burris reviewed Plaintiff's records in connection with a prior unsuccessful disability application.

Plaintiff argues that the ALJ's analysis is illogical, because the only "treatment" Plaintiff received was a recommendation that she wear cock-up splints.  (Tr. 368). Plaintiff argues that there is no evidence that her CTS improved following the 2006 nerve studies that confirmed moderately severe bilateral CTS.  (Tr. 363-364).  Dr. Ezike reviewed the entire record, including Plaintiff's 2006 report of "nerve damage" from diabetic neuropathy (Tr. 368) before concluding that Plaintiff should be required to use her upper extremities to feel only occasionally, and to handle and finger not more than frequently.  (Tr. 654).

It is unclear whether the "occasional" feeling, and "frequent" handling and fingering limitations offered by Dr. Ezike would have precluded Plaintiff's past work as housekeeper.  As Plaintiff herself points out, the Dictionary of Occupational Titles and O*Net both state that a hotel housekeeper must use her hands at least frequently. Regardless, the ALJ did not err in rejecting the referenced limitations based upon the lack of any evidence following Plaintiff's treatment in 2006 that she continued to suffer work-related symptoms of CTS.

The Court takes judicial notice of the fact that carpal tunnel syndrome is a relatively common diagnosis.  The National Institute of Neurological Disorders and Stroke, under the auspices of the National Institutes of Health, states on its Carpal Tunnel Syndrome Fact Sheet that "[r]ecurrence of carpal tunnel syndrome following treatment is rare," and that the "majority of patients recover completely." *See* http://www.ninds.nih.gov/disorders/carpal_tunnel/detail_carpal_tunnel.htm, publication date July 2012, accessed on June 18, 2013.  In fact, the temporary use of splints or braces to immobilize the wrists is the most common form of treatment prescribed for

CTS.  *Id.*     Plaintiff cites no evidence other than Dr. Ezike's opinion after Plaintiff's treatment in 2006 that would support a CTS-related limitation.  By contrast, at least four post-2006 medical opinions, as well as Plaintiff's own testimony, provide substantial evidence to support the ALJ's rejection of such limitations.

The undersigned would start with Plaintiff's hearing testimony, which was elicited in response to her attorney's questions:

> Q.  …Now, there was some mention of problems with your hands, maybe some carpal tunnel syndrome or something is that right?
>
> A.  Well, they had told me at one time when I was working but I never really had any problem.  I did at first, that was what made me go to the doctor and they said something about carpel tunnel and I had the braces.  But then after that it was okay but a have a knot right here in my [right] wrist.
>
>            ….
>
> Q.  Okay.  And does that knot cause any pain?
>
> A.  No, not really….

(Tr. 49).  In light of her client's responses, Plaintiff's counsel stated, "Okay.  So the hands aren't that big a deal right now." (*Id*).    Questioned about additional impairments by counsel, Plaintiff testified that she had experienced headaches for a while but that was also no longer a problem, and that she has neck stiffness that does not cause any difficulty but is merely "annoying."  (Tr. 50).  She affirmatively responded when asked by counsel if her claim was based on her knees, her back, and her diabetes.  (Tr. 50).

Defendant also points to more recent medical evidence.  For example, at a consulting examination in December 2008, Dr. Staley specifically found that Plaintiff's

fine motor skills were normal, such that no manipulative limitations were required. (Tr. 502-503). The ALJ gave "greater weight" to the opinion of Dr. Staley in this regard.[3]

Plaintiff argues that the ALJ should not have adopted Dr. Staley's opinion that Plaintiff had no hand limitations, because Dr. Staley conducted only a "brief examination which did not require Plaintiff to use her hands for handling or fingering to a degree anywhere near that required for working." (Doc. 16 at 2). However, Plaintiff cites no support for the proposition that an examining consultant must conduct a physical examination under simulated work conditions. Presumably, Dr. Staley also did not base Plaintiff's postural limitations, which Plaintiff advocates in favor of, on testing conducted over the course of an eight-hour work day in a simulated work environment. Plaintiff argues that Dr. Staley's clinical findings should not negate her 2006 EMG test results. The fact that most CTS cases are treated successfully, the lack of more recent reported symptoms or nerve conduction studies suggesting continuing symptoms, in combination with clinical evidence that conflicts with continued severe symptoms and Plaintiff's own testimony, all provide substantial evidence to uphold the ALJ's determination.

For different reasons, the undersigned finds no error in the ALJ's rejection of the 2006 opinion of Dr. Burris that Plaintiff could only occasionally use her hands for fine manipulation (fingering) due to CTS. (Tr. 381). Although the ALJ stated that he was giving Dr. Burris's opinion "significant weight," Dr. Burris opined that Plaintiff could perform work at an exertional level consistent with medium work, rather than the more favorable light work level determined by the ALJ. (Tr. 379).

---

[3]The ALJ adopted this part of Dr. Staley's opinion, but rejected his opinions concerning Plaintiff's alleged postural limitations. Plaintiff advocates for reversal of both findings, arguing that the ALJ should have rejected Dr. Staley's findings on her hand limitations, but adopted the postural limitations.

The Defendant concedes that the ALJ erred by stating that he was giving "significant weight" to the Burris opinion, but then failing to adopt the limitations that he suggested. However, the Defendant persuasively argues that this error was harmless. Dr. Burris opined that Plaintiff could perform medium work. Thus, the ALJ's failure to adopt findings relating to that opinion resulted in an RFC that was, on the whole, more favorable to Plaintiff. In any event, Dr. Burris's fingering limitation is undermined by the date on which it was offered - nearly a year and a half prior to Plaintiff's alleged onset date of October 2007. Given that treatment was prescribed and that the majority of CTS sufferers experience improvement after treatment, and again noting Plaintiff's own testimony, the undersigned agrees that the passage of time undermines the validity of Dr. Burris's fingering restriction.

Defendant also asserts that "there is no indication that *Mr.* Burris was a doctor at all – there is no degree or title next to his name, no medical consultant code listed indicating any sort of medical specialty, and he is not listed in the American Medical Association's physician listings in the state of Ohio." (Doc. 14 at 13, emphasis added, footnote omitted). However, the undersigned can find no basis for speculating about Dr. Burris's credentials based solely upon the alleged absence of proof concerning his AMA listing.[4] The Commissioner, through the ALJ, clearly relied upon the physical RFC completed by "Dr. Michael Burris on behalf of the State agency" as support for the Commissioner's final decision. The difficulty in proving a negative is widely acknowledged, and holds true in this case. The RFC form that identifies "Michael

---

[4]As noted by Plaintiff, the fact that Dr. Burris is not currently listed in the AMA listings for physicians in Ohio does not mean that he was not listed in 2006 when he completed the referenced RFC form.

Burris" as the "medical consultant" is the same type of RFC form that is completed – virtually always- either by an agency physician or psychologist.  (Tr. 385).  The RFC form refers to and provides analysis of specific medical records, and appears unlikely to have been completed by a non-physician.  Nevertheless, for the reasons previously noted, the ALJ's failure to adopt the fingering limitations offered by Dr. Burris provides no grounds for reversal.

Although Plaintiff's hearing testimony alone arguably provides the substantial evidence that is needed to affirm the ALJ's finding, additional medical evidence also supports the decision.  Dr. Burge pointed out that Plaintiff did not complain of hand pain or similar limitations to Dr. Staley in 2008.  Drs. Burge, Gregg, and Suetholz all agreed that Plaintiff did not require manipulative limitations and/or restrictions on the use of her hands.  (Tr. 509, 513, 574, 588).  As discussed below, the ALJ properly gave their opinions great weight.

In her reply, Plaintiff speculates that Drs. Burge, Gregg, and Suetholz may not have specifically reviewed the 2006 EMG results. (Doc. 16 at 3).  However, the undersigned rejects this hypothesis as unsupported.

## 2.  Alleged Errors in the Weight Given to Medical Evidence

In her second assignment of error, Plaintiff argues that the ALJ improperly weighed the opinions of two consulting physicians, as well as the opinion of one of her treating physicians.

### a.  Dr. Burris

First, Plaintiff asserts that the ALJ erred in assigning "significant weight" to the opinion of non-examining consultant Dr. Burris, dated May 2006, (Tr. 19), but then failed

to adopt many of the limitations on which Dr. Burris opined.  As previously stated, there is no question that the ALJ erred in this respect.  Dr. Burris opined that Plaintiff could perform work at the less restrictive medium level, whereas the ALJ determined that Plaintiff could perform work only at the light level.  Dr. Burris included the referenced handling, fingering, and feeling limitations, but the ALJ found no such limitations.  (*Id.*). Despite the error in failing to articulate the reasons for these deviations from an opinion to which he attached "significant weight," the undersigned finds the error to be harmless for the reasons previously discussed.

### b.  Dr. Ezike

The ALJ assigned only "some weight" to Dr. Ezike's medical opinions, stating:

> Dr. Ezike's identification of the claimant's severe impairments is not fully consistent nor is it supported by the objective medical evidence of record. For example, there is no evidence that CTS remains an impairment following the claimant's treatment in 2006.  Further, post-hearing records supplied after the medical expert testified do not support the limitations for sedentary work. (30F).

(Tr. 19-20).  Plaintiff argues that the ALJ's analysis does not provide a sufficient basis to reject some of Dr. Ezike's opinions.  Although most of Dr. Ezike's opinions were consistent with the light exertional level (Tr. 652-653), on cross-examination he allowed that it would be "reasonable" that Plaintiff "might" need to alternate positions of sitting and standing (Tr. 34-35).[5]  If Dr. Ezike's opinion had been adopted in full, limiting Plaintiff to 4-6 hours of standing/walking, the VE testified she would be limited to sedentary work rather than the light exertional level.  (Tr. 70-71).  Plaintiff points out that

_____

[5]After counsel reiterated the opinion that Plaintiff's osteoarthritis would limit her to 4-6 hours of sitting and standing/walking, Dr. Ezike agreed with counsel's somewhat equivocal question:  "Is it reasonable to think that she might also need to alternate positions at times from sitting to standing?"

if limited to the sedentary level, she would be entitled to a presumption of disability under the Medical-Vocational Guidelines.

Many of Dr. Ezike's opinions were consistent with the RFC findings determined by the ALJ. However, the opinions that the ALJ did not accept included the CTS-related limitations, limitations relating to Plaintiff's ability to climb ladders/ropes/scaffolds ("never" rather than "occasionally"), and avoidance of extreme cold due to arthritis. (Tr. 649-655). As referenced by the VE's testimony, the most pivotal limitation rejected by the ALJ was Dr. Ezike's opinion that Plaintiff would be limited to 4-6 hours of standing and/or walking, contrasted with the ALJ's determination that Plaintiff could sit, stand, or walk for six hours each.

The undersigned finds no error in the ALJ's rejection of the referenced opinions. As with Dr. Burris, Dr. Ezike was a non-examining consultant. Although an ALJ must consider every medical source opinion, an ALJ is not legally required to articulate as extensively his reasons for rejecting the opinions of a non-examining consultant, as he is when he rejects the opinion of a treating physician. *Compare* 20 C.F.R. §404.1527(c)(2) (dictating that "good reasons" be given for the weight given to "your treating source's opinion."). The CTS evidence has been previously discussed and substantial evidence supports the ALJ's determination concerning that impairment and the limitations assigned thereto.

Similarly, although Plaintiff complains that the ALJ's reference to Exhibit 30F does not fully support the ALJ's opinion that Plaintiff can perform light work, the undersigned concludes that not only does Exhibit 30F provide support, but other

evidence supports the ALJ's conclusion that Plaintiff is not as limited as Dr. Ezike believed.

As noted by the ALJ elsewhere in his opinion, (Tr. 19), Plaintiff's examinations were mostly normal.  On clinical exam, Dr. Staley found normal strength, normal range of motion, normal reflexes in Plaintiff's extremities, and a normal gait.  (Tr. 500-503). On four additional dates in 2009 and 2010, examinations revealed normal findings in Plaintiff's extremities, full range of motion, and normal strength.  (Tr. 20, 624, 631, 644, 671).  Although Plaintiff testified that someone at the free clinic had provided her with a cane, no documentation confirmed that a cane had been prescribed.  Despite a nurse's notation that she had a limp and used a cane (Tr. 629) at one ER visit for suspected sciatica-related right leg pain, that single record does not refute the substantial evidence that supports the ALJ's determination that she can stand/walk and/or sit for up to six hours in an eight hour day.

### c.  Dr. Suetholz

Plaintiff argues more strenuously that the ALJ improperly rejected the opinions of her treating physician, Dr. Suetholz.  The opinion of a treating physician must be given "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is not "inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§404.1527(c)(2); 416.927(c)(2).  On the other hand, opinions on the ultimate issues of disability, or concerning an individual's RFC, are not the type of opinions that must be given "controlling weight" insofar as those issues are "reserved to the Commissioner."  See 20 C.F.R. §404.1527(d)(2).  In

this case, the undersigned finds no error in the ALJ's determination that Dr. Suetholz's opinions concerning Plaintiff's limitations were not entitled to controlling weight.

At the time of the hearing, Plaintiff had seen Dr. Suitholz three times over the course of six months.  On her first visit on January 6, 2010, Dr. Suitholz noted no abnormalities upon exam, other than Plaintiff's reports of pain in her "right upper quadrant" and right thigh. (Tr. 689).  On her second visit on March 29, 2010, Dr. Suetholz completed an RFC form in which he opined that Plaintiff can stand and/or walk or sit no more than 2 hours per day, that she can lift no more than 10 pounds occasionally, and that she can only rarely stoop, bend, crouch or squat, (Tr. 586-587), based on abnormal examination findings on the same date. (Tr. 688).  These limitations would restrict Plaintiff to part-time sedentary work, and therefore would render Plaintiff disabled.

Plaintiff complains that the ALJ failed to explain precisely what portion of Dr. Suetholz's progress notes, submitted post-hearing (Exhibit 30F at Tr. 687-689), contradicted the more severe limitations that were rejected by the ALJ.  The undersigned has reviewed the referenced exhibit and finds no error.  The three pages of clinical records submitted contain minimal findings, and do not support Dr. Suetholz's extreme RFC opinions.

The ALJ explained that he was giving "less weight" to Dr. Suetholz's RFC opinion, in which he opined that the claimant's "disease state," referring to Plaintiff's poorly controlled diabetes and neuropathy (Tr. 583), rendered her incapable of even low stress jobs.  (Tr. 20).  Even though Plaintiff stated on a disability application that she could lift about 20 pounds (Tr. 212), Dr. Suetholz opined that she could only

occasionally lift up to 10 pounds, and never climb stairs or ladders, and only rarely squat, crouch or stoop, and placed checkmarks on a form indicating "abnormal" findings in the following areas: "gait/station," "digits/nails" and "range of motion."  (Tr. 586, 688). However, Dr. Suetholz provided no details, such as how Plaintiff was limited in her range of motion, or to what degree.[6]  (*See* Tr. 688).  In rejecting his RFC opinions, the ALJ explained:

> He further opined that the claimant has numerous postural limitations and can sit, stand, and walk for a total of less than 2 hours each (*Id.* at 5).  Dr. Suetholz's findings are not supported by the objective medical evidence of record.  Most notably, the claimant's physical examination on September 22, 2009, October 19, 2009, and April 18, 2010 showed normal extremities with adequate strength and full range of motion and normal mood and affect….  Imaging studies are also within normal limits (27F). Dr. Suetholz's assessment is also not consistent with less benign reports of symptoms throughout the medical evidence of record and he is not a source shown to be familiar with Social Security Administration regulations or occupational medicine.

(Tr. 20).  Not only did Dr. Suetholz opine that Plaintiff was limited to 2 hours per day of sitting, standing/walking, but he indicated that she could perform those activities for not more than 15 minute increments, and that she required the ability to alternate between sitting and standing.   (Tr. 587). Plaintiff concedes that Dr. Suetholz believed that Plaintiff's postural limitations would restrict work to no more than four hours per day, but argues that is not the same as implying that Plaintiff would have to stay in bed for the remainder of a 24 hour day, because an RFC determination focuses only the workday.

Plaintiff complains that three of four examinations cited by the ALJ as revealing "normal" findings were Emergency Room visits, at times when Plaintiff had sought relief

---

[6]As discussed above regarding the alleged CTS error, Dr. Suetholz did not indicate any restrictions on Plaintiff's use of her hands.  Because Dr. Suetholz's handling and fingering limitations were not favorable to her, Plaintiff agrees with the ALJ's decision to give that specific opinion little weight.

from "pain not associated with the disabilities for which Plaintiff is seeking benefits." (Doc. 11 at 15).  Plaintiff hypothesizes that the examining physicians were simply not thorough, and presumably made only "cursory observations of those body systems which [were] not involved" with Plaintiff's primary complaint.  (*Id.*).  Other than her own belief, however, Plaintiff offers no support for her argument that ER physicians did not perform thorough examinations, or that they made inaccurate observations when they evaluated Plaintiff's body systems.  It was not unreasonable for the ALJ to assume that the ER examinations were complete, thorough, and accurate.  Plaintiff's speculative argument to the contrary is undercut by review of the records.  For example, Plaintiff's primary complaint at the October 2009 ER visit was thigh pain, resulting in a full musculoskeletal examination that noted a full range of motion in all extremities, no swelling, no muscle spasm, a normal neurologic exam, and a normal gait without use of any assistive device.  (Tr. 630-631).  Although the exam revealed tenderness to palpation of Plaintiff's right thigh, which required treatment with pain medication, (Tr. 623, 625, 629, 631), Plaintiff's thigh pain on that occasion does not prove that she requires limitations on standing and walking – indeed, Plaintiff inconsistently first claims that her ER visits were for "pain not associated" with Plaintiff's claimed disabilities, but later in her reply memorandum suggests that her reported leg pain at ER visits might support standing/walking limitations. (Doc. 16 at 6).  Adding to the reasonableness of the ALJ's viewpoint that the normal findings during ER visits did not support severe limitations, the cited examination dates took place close in time to Dr. Suetholz's examination.

Plaintiff also points to contrary evidence in the records of other clinical examinations in which complaints were recorded. See Tr. 516, 594, suspected osteoarthritic knee pain while climbing stairs to third floor apartment; Tr. 644, right knee pain, no abnormal findings; Tr. 590, right hip pain, some swelling noted; Tr. 517; Tr. 595, burning thigh pain reported twice in two months, also calf pain; Tr. 631, thigh tender with no other abnormal findings; Tr. 689, diffuse pain reported; Tr. 419, 422, mild findings consistent with cervical strain/spasm, otherwise normal CT and Xray.  Plaintiff notes records that allegedly support a limited ability to stoop/bend and decreased sensation in her lower extremities (Tr. 502, 525), weakness of thumb opposition and only trace reflexes in her upper extremities (Tr. 363, 426), and the single ER notation of her limp and use of a cane (Tr. 629).  Last, Plaintiff claims that Dr. Suetholz's opinions find general support in the records of another treating physician, Dr. Lowe (Tr. 360-366), as well as the records of the Scott Street Health Center/Pike Street Medical Clinic (Tr. 516-550, 589-621), hospital records (Tr. 354-359, 386-473, 579-582, 622-648) and the opinions of Dr. Ezike.  As partially suggested by the above descriptions, not all of the records cited by Plaintiff corroborate her claims, as many reflect normal findings.

Regardless, the existence of some corroborative records does not mean that the ALJ's analysis is unsupported.  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance."  *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  The fact that substantial evidence may exist to support a contrary result is not grounds for reversal, so long as "such relevant evidence as a reasonable mind might accept as adequate to support" the decision reached by the Commissioner.  *Id.*  Close examination of the records cited by Plaintiff confirms that they

provide no grounds for reversal in this case. On the whole, the records reflect exam dates – many in 2006 - that were not as close in time to the records that contradicted Dr. Suetholz's assessment, and a great number reflect only subjective reports. Ample medical evidence – particularly the reports of Drs. Staley, Burge, and Gregg, as well as some of the testimony of Dr. Ezike – supported the RFC findings made by the ALJ.

In addition, the Defendant points out that "the Sixth Circuit has declined to find that an ongoing treatment relationship exists after just two or three examinations." *Cooper v. Astrue*, 2011 WL 1118514 (S.D. Ohio, Jan. 25, 2011)(citing *Boucher v. Apfel*, 2000 WL 1769520 (6th Cir. Nov. 15, 2000)). In this case, Dr. Suetholz examined Plaintiff just twice before completing the RFC form. Plaintiff argues that the facts of this case fall closer to those presented in *Smith v. Com'r of Soc. Sec.*, 2012 WL 1665513 (S.D. Ohio, May 11, 2012), wherein a primary care physician "saw plaintiff on a regular basis and treated her four times before issuing his functional assessment."). The undersigned is not convinced that seeing a patient just twice before an RFC assessment, with no abnormal findings at the first visit, makes this case analogous to *Smith*. However, none of the cases cited by either Plaintiff or Defendant are published, and, importantly, the ALJ did not state that he was disregarding Dr. Suetholz's opinions because his relationship with Plaintiff was too brief to qualify as a treating physician. The brevity of the relationship thus adds only indirectly to the body of substantial evidence that supports the ALJ's rejection of Dr. Suetholz's opinions.

Plaintiff contends that the ALJ's comment that Dr. Suetholz was not familiar with agency regulations or occupational medicine also constitutes error, since the regulations do not require a treating physician to be either familiar with either of them, in

order for his opinion to be entitled to controlling weight.  While an accurate statement of

the regulatory framework, Plaintiff's argument ignores the fact that the same framework

permits an ALJ to consider a physician's specialty when considering how much weight

to give to his or her opinion.  20 C.F.R. §§404.1527(c)(5), 416.927(c)(5).  Therefore, the

ALJ's analysis reflects no error.

### 3. Credibility Assessment

In her final claim, Plaintiff contends that the ALJ improperly evaluated her

credibility.  An ALJ's credibility assessment must be supported by substantial evidence,

but "an ALJ's findings based on the credibility of the applicant are to be accorded great

weight and deference, particularly since an ALJ is charged with the duty of observing a

witness's demeanor and credibility."  *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531

(6th Cir. 1997).  Further, a credibility determination cannot be disturbed "absent a

compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Thus, it is

proper for an ALJ to discount the claimant's testimony where there are contradictions

among the medical records, her testimony, and other evidence.  *Warner v. Com'r of

Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

The ALJ stated that he found that Plaintiff's statements about the intensity,

persistence, or functionally limiting effects of her neuropathy and other complaints,

including her allegations of disabling mental impairments, were "not credible to the

extent that they are inconsistent" with the RFC as determined by the ALJ.  (Tr. 19).

> The objective medical evidence is not consistent with the claimant's
> subjective allegations about the nature and severity of her pain.  Although
> the claimant complained of constant pain in her back, as well as pain due
> to neuropathy, and numerous functional limitations, on examination on
> December 13, 2008, the claimant had normal range of motion testing, no
> tenderness to palpation over the lower lumbar spine, normal gait and

station, and she had no difficulty stooping or bending. (14F/3).  Further, on examination in September and October 2009, the claimant was noted to have a full range of motion in all extremities and normal motor function. …

The claimant also complained of depression; however, on examination on March 15, 2010, her mood and affect were noted to be normal (27F/23).

In addition, the claimant's activities of daily living described during the course of the hearing are inconsistent with her prior reports to treating sources throughout the medical evidence of record.  In fact, her testimony at the hearing was significantly more restricted than prior reports.  During a consultative psychological evaluation in April 2006, the claimant reported visiting friends during the day, doing laundry, and watching television. (4F/4).  She stated, "I have to be doing something; I cannot just sit still." (Id.).  During her evaluation in November 2008, the claimant reported performing household chores including washing dishes, laundry, cooking, and dusting. (10F/5).

Other factors further belie the claimant's credibility.  For example, hospital records dated March 11, 2008 describe the claimant as "a noncompliant type II diabetic" and note that she does not take her medications properly (8F/1).  These records also note that the claimant is a persistent smoker. (Id.).

(Tr. 19).

Plaintiff does not dispute that the peripheral diabetic neuropathy pain of which she complained is not so severe that it would meet or equal Listing 11.14.  (*See* Tr. 16, explaining why Plaintiff's peripheral neuropathy is not of listing level severity).  She also does not dispute the ALJ's findings concerning the credibility of her complaints concerning the level of her mental impairments.

Nevertheless, Plaintiff argues that the ALJ's overall credibility analysis – particularly concerning the level of her pain, and whether or not she can perform work at a "light" rather than only a "sedentary" level warrants remand.   First, Plaintiff complains that the decision must be remanded because of "circular logic and boilerplate language," based upon the single sentence wherein the ALJ determined that Plaintiff's

"symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC determination. (Doc. 11 at 19). While the undersigned does not find this phrase helpful and does not dispute that some version of the same sentence is often found in ALJ decisions, and in that respect could be termed "boilerplate," the Court strongly disagrees with the supposition that remand is required in any social security case in which an ALJ uses a common phrase or sentence. As the lengthy quotation illustrates, the ALJ's credibility analysis in this case was quite detailed, containing very specific and accurate references to instances in which Plaintiff's testimony was contradicted by the record, including clinical evidence, objective findings, and her own statements.

Plaintiff complained of constant back pain and neuropathic pain in her legs. Plaintiff focuses heavily on the single ER record, in which a nurse noted Plaintiff's limp and use of a cane (Tr. 629), in favor of a more positive credibility finding. Plaintiff points out that the ER physician injected pain medication and prescribed narcotic medication. (Tr. 625, 631). However, these records did not require the ALJ to determine that *all* of Plaintiff's allegations concerning the severity of her pain were fully credible. Other evidence – both explicitly noted by the ALJ and implicitly included and considered as part of the record as a whole – provides substantial evidence for his determination that Plaintiff's diabetic neuropathy was not so constant and severe that it required additional RFC limitations.

Plaintiff also contends that the ALJ was wrong to note inconsistencies between her hearing testimony regarding her activities of daily living, and what she previously reported during the disability application process and to consulting physicians or psychologists. Plaintiff reported on her application forms that she regularly took only

over-the-counter medications, such as Advil or Aleve, to help with her pain.  (Tr. 201).

She reported that her daily activities include washing dishes, sweeping, dusting, and

mopping to the extent needed to clean her apartment, and that she could manage her

own self care and hygiene, albeit with some difficulty.  (Tr. 203, 208).  Plaintiff's friend

explained that she sometimes needs assistance with manipulating buttons (Tr. 219),

and her daughter reported that her hands cramp up when she brushes her hair, and that

Plaintiff occasionally has trouble getting off the toilet.  (Tr. 237).  Plaintiff reported doing

laundry "on a good day."  (Tr. 209-210).  She also reported walking to the library and to

her daughter's house (Tr. 207), and stated that she could shop, pay her bills, use a

checkbook, and handle a savings account (Tr. 210).  She stated that she could lift 20

pounds, consistent with a light exertional level.  (Tr. 212).

Plaintiff suggests that any inconsistencies can be explained by her activity level

on "good days," and asserts that the earlier reports do not specify "that she was able to

perform the tasks well," (Doc. 11 at 21).  She argues that her testimony was not truly

inconsistent, but merely "clarified" that she could only perform the referenced chores

with the assistance of siblings. (Tr. 46).  To the extent that inconsistencies cannot

otherwise be explained, she contends that it is "reasonable" that her "ability to perform

activities of daily living has diminished over time."  (Doc. 11 at 21).  However, the fact

that the many inconsistent statements made by Plaintiff can be explained in a manner

more favorable to her case does not mean that the ALJ erred in reaching a contrary,

reasonable conclusion concerning Plaintiff's credibility.

In a final attack on the ALJ's credibility determination, Plaintiff argues that the

ALJ should not have noted that she was a "non-compliant" type II diabetic and a

smoker, without considering the reasons for her non-compliance.  Plaintiff points to a March 20, 2008 record in which Plaintiff reported not using prescribed diabetic medication based on "financial reasons."  (Tr. 596).  Plaintiff additionally contends that in light of the addictive nature of smoking, the ALJ should not have considered her failure to give up smoking as part of his credibility determination.  However, the ALJ's consideration of Plaintiff's compliance with treatment was permissible under the regulations.  See 20 C.F.R. §§404.1530(a), 416.930(a).  The medical record on which the ALJ relied noted that Plaintiff did not take her medicine and yet "continues to smoke a pack or more per day,"  and cautioned that Plaintiff's condition was likely to grow worse with continued non-compliance.  (Tr. 401).  The record reflects that "she needs to stay on her diet, stay on her medications…needs to stop smoking."  (*Id*.).  The ALJ reasonably questioned Plaintiff's credibility when, notwithstanding her alleged financial difficulties and clear medical advice in opposition to her behavior, she was able to continue purchasing at least one or more packs of cigarettes every day.  *See Sias v. Sec'y of HHS*, 861 F.2d 475, 480 (6th Cir. 1988)(credibility undermined by claimant's argument that he could not afford prescribed treatment, but had adequate funds to purchase cigarettes).[7]

### III. Conclusion and Recommendation

For the reasons discussed, **IT IS RECOMMENDED THAT** the decision of the Commissioner to deny Plaintiff SSI benefits be **AFFIRMED** because it is supported by substantial evidence in the record as a whole, and that this case be closed.

---

[7]While "continued smoking …does not *per se* disqualify a Plaintiff from receiving disability benefits," *see Becker v. Com'r of Soc. Sec.*, 2009 WL 483833 at n.6 (S.D. Ohio, Feb. 25, 2009), a patient's compliance with treatment is always permissible to consider.

_/s Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

LORNA CEASAR,                                    Case No. 1:12-cv-548

        Plaintiff,                               Spiegel, J.
                                                 Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).